(Slip Opinion)     OCTOBER  TERM,  2008     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SUMMERS ET AL. *v.* EARTH ISLAND INSTITUTE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 07–463.   Argued October 8, 2008—Decided March 3, 2009

After the U. S. Forest Service approved the Burnt Ridge Project, a salvage sale of timber on 238 acres of fire-damaged federal land, respondent environmentalist organizations filed suit to enjoin the Service from applying its regulations exempting such small sales from the notice, comment, and appeal process it uses for more significant land management decisions, and to challenge other regulations that did not apply to Burnt Ridge. The District Court granted a preliminary injunction against the sale, and the parties then settled their dispute as to Burnt Ridge. Although concluding that the sale was no longer at issue, and despite the Government's argument that respondents therefore lacked standing to challenge the regulations, the court nevertheless proceeded to adjudicate the merits of their challenges, invalidating several regulations, including the notice and comment and the appeal provisions. Among its rulings, the Ninth Circuit affirmed the determination that the latter regulations, which were applicable to Burnt Ridge, were contrary to law, but held that challenges to other regulations not at issue in that project were not ripe for adjudication.

*Held:* Respondents lack standing to challenge the regulations still at issue absent a live dispute over a concrete application of those regulations. Pp. 4–12.

  (a) In limiting the judicial power to "Cases" and "Controversies," Article III restricts it to redressing or preventing actual or imminently threatened injury to persons caused by violation of law. See, *e.g., Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 559–560. The standing doctrine reflects this fundamental limitation, requiring that "the plaintiff . . . 'alleg[e] such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdic-

tion," *Warth* v. *Seldin*, 422 U. S. 490, 498–499.  Here, respondents can demonstrate standing only if application of the regulations will affect *them* in such a manner.  Pp. 4–5.

    (b) As organizations, respondents can assert their members' standing.  Harm to their members' recreational, or even their mere esthetic, interests in the National Forests will suffice to establish the requisite concrete and particularized injury, see *Sierra Club* v. *Morton*, 405 U. S. 727, 734–736, but generalized harm to the forest or the environment will not alone suffice.  Respondents have identified no application of the invalidated regulations that threatens imminent and concrete harm to their members' interests.  Respondents' argument that they have standing based on Burnt Ridge fails because, after voluntarily settling the portion of their lawsuit relevant to Burnt Ridge, respondents and their members are no longer under threat of injury from that project.  The remaining affidavit submitted in support of standing fails to establish that any member has concrete plans to visit a site where the challenged regulations are being applied in a manner that will harm that member's concrete interests.  Additional affidavits purporting to establish standing were submitted after judgment had already been entered and notice of appeal filed, and are thus untimely.  Pp. 5–8.

    (c) Respondents' argument that they have standing because they have suffered procedural injury—*i.e.,* they have been denied the ability to file comments on some Forest Service actions and will continue to be so denied—fails because such a deprivation without some concrete interest affected thereby is insufficient to create Article III standing.  See, *e.g., Defenders of Wildlife, supra*, at 572, n. 7.  Pp. 8–9.

    (d) The dissent's objections are addressed and rejected.  Pp. 9–12.

490 F. 3d 687, reversed in part and affirmed in part.

    SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO, JJ., joined.  KENNEDY, J., filed a concurring opinion.  BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–463

PRISCILLA SUMMERS, ET AL., PETITIONERS *v.* EARTH ISLAND INSTITUTE ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 3, 2009]

JUSTICE SCALIA delivered the opinion of the Court.

Respondents are a group of organizations dedicated to protecting the environment. (We will refer to them collectively as "Earth Island.") They seek to prevent the United States Forest Service from enforcing regulations that exempt small fire-rehabilitation and timber-salvage projects from the notice, comment, and appeal process used by the Forest Service for more significant land management decisions. We must determine whether respondents have standing to challenge the regulations in the absence of a live dispute over a concrete application of those regulations.

I

In 1992, Congress enacted the Forest Service Decisionmaking and Appeals Reform Act (Appeals Reform Act or Act), Pub. L. 102–381, Tit. III, §322, 106 Stat. 1419, note following 16 U. S. C. §1612. Among other things, this required the Forest Service to establish a notice, comment, and appeal process for "proposed actions of the Forest Service concerning projects and activities implementing land and resource management plans developed under the

Forest and Rangeland Renewable Resources Planning Act of 1974." *Ibid.*

The Forest Service's regulations implementing the Act provided that certain of its procedures would not be applied to projects that the Service considered categorically excluded from the requirement to file an environmental impact statement (EIS) or environmental assessment (EA). 36 CFR §§215.4(a) (notice and comment), 215.12(f) (appeal) (2008). Later amendments to the Forest Service's manual of implementing procedures, adopted by rule after notice and comment, provided that fire-rehabilitation activities on areas of less than 4,200 acres, and salvage-timber sales of 250 acres or less, did not cause a significant environmental impact and thus would be categorically exempt from the requirement to file an EIS or EA. 68 Fed. Reg. 33824 (2003) (Forest Service Handbook (FSH) 1909.15, ch. 30, §31.2(11)); 68 Fed. Reg. 44607 (FSH 1909.15, ch. 30, §31.2(13)). This had the effect of excluding these projects from the notice, comment, and appeal process.

In the summer of 2002, fire burned a significant area of the Sequoia National Forest. In September 2003, the Service issued a decision memo approving the Burnt Ridge Project, a salvage sale of timber on 238 acres damaged by that fire. Pursuant to its categorical exclusion of salvage sales of less than 250 acres, the Forest Service did not provide notice in a form consistent with the Appeals Reform Act, did not provide a period of public comment, and did not make an appeal process available.

In December 2003, respondents filed a complaint in the Eastern District of California, challenging the failure of the Forest Service to apply to the Burnt Ridge Project §215.4(a) of its regulations implementing the Appeals Reform Act (requiring prior notice and comment), and §215.12(f) of the regulations (setting forth an appeal procedure). The complaint also challenged six other Forest

Service regulations implementing the Act that were not applied to the Burnt Ridge Project. They are irrelevant to this appeal.

The District Court granted a preliminary injunction against the Burnt Ridge salvage-timber sale. Soon thereafter, the parties settled their dispute over the Burnt Ridge Project and the District Court concluded that "the Burnt Ridge timber sale is not at issue in this case." *Earth Island Inst.* v. *Pengilly*, 376 F. Supp. 2d 994, 999 (ED Cal. 2005). The Government argued that, with the Burnt Ridge dispute settled, and with no other project before the court in which respondents were threatened with injury in fact, respondents lacked standing to challenge the regulations; and that absent a concrete dispute over a particular project a challenge to the regulations would not be ripe. The District Court proceeded, however, to adjudicate the merits of Earth Island's challenges. It invalidated five of the regulations (including §§215.4(a) and 215.12(f)), *id.,* at 1011, and entered a nationwide injunction against their application, *Earth Island Inst.* v. *Ruthenbeck*, No. CIV F–03–6386 JKS, 2005 WL 5280466 *2 (Sept. 20, 2005).

The Ninth Circuit held that Earth Island's challenges to regulations not at issue in the Burnt Ridge Project were not ripe for adjudication because there was "not a sufficient 'case or controversy'" before the court to sustain a facial challenge. *Earth Island Inst.* v. *Ruthenbeck*, 490 F. 3d 687, 696 (2007) (amended opinion). It affirmed, however, the District Court's determination that §§215.4(a) and 215.12(f), which were applicable to the Burnt Ridge Project, were contrary to law, and upheld the nationwide injunction against their application.

The Government sought review of the question whether Earth Island could challenge the regulations at issue in the Burnt Ridge Project, and if so whether a nationwide injunction was appropriate relief. We granted certiorari,

552 U. S. ___ (2008).

## II

In limiting the judicial power to "Cases" and "Contro-versies," Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law. Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action. See *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 559–560 (1992); *Los Angeles* v. *Lyons*, 461 U. S. 95, 111–112 (1983). This limitation "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth* v. *Seldin*, 422 U. S. 490, 498 (1975). See *United States* v. *Richardson*, 418 U. S. 166, 179 (1974).

The doctrine of standing is one of several doctrines that reflect this fundamental limitation. It requires federal courts to satisfy themselves that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." 422 U. S., at 498–499. He bears the burden of showing that he has standing for each type of relief sought. See *Lyons, supra,* at 105. To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury. *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 180–181 (2000). This requirement assures that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party," *Schlesinger* v. *Reservists Comm. to Stop the War*,

418 U. S. 208, 221 (1974). Where that need does not exist, allowing courts to oversee legislative or executive action "would significantly alter the allocation of power . . . away from a democratic form of government," *Richardson, supra*, at 188 (Powell, J., concurring).

The regulations under challenge here neither require nor forbid any action on the part of respondents. The standards and procedures that they prescribe for Forest Service appeals govern only the conduct of Forest Service officials engaged in project planning. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife, supra*, at 562. Here, respondents can demonstrate standing only if application of the regulations by the Government will affect *them* in the manner described above.

It is common ground that the respondent organizations can assert the standing of their members. To establish the concrete and particularized injury that standing requires, respondents point to their members' recreational interests in the National Forests. While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice. *Sierra Club* v. *Morton*, 405 U. S. 727, 734–736 (1972).

Affidavits submitted to the District Court alleged that organization member Ara Marderosian had repeatedly visited the Burnt Ridge site, that he had imminent plans to do so again, and that his interests in viewing the flora and fauna of the area would be harmed if the Burnt Ridge Project went forward without incorporation of the ideas he would have suggested if the Forest Service had provided him an opportunity to comment. The Government concedes this was sufficient to establish Article III standing with respect to Burnt Ridge. Brief for Petitioners 28.

Marderosian's threatened injury with regard to that pro-
ject was originally one of the bases for the present suit.
After the District Court had issued a preliminary injunc-
tion, however, the parties settled their differences on that
score. Marderosian's injury in fact with regard to that
project has been remedied, and it is, as the District Court
pronounced, "not at issue in this case." 376 F. Supp. 2d, at
999. We know of no precedent for the proposition that
when a plaintiff has sued to challenge the lawfulness of
certain action or threatened action but has settled that
suit, he retains standing to challenge the basis for that
action (here, the regulation in the abstract), apart from
any concrete application that threatens imminent harm to
his interests. Such a holding would fly in the face of Arti-
cle III's injury-in-fact requirement. See *Lyons, supra*, at
111.

Respondents have identified no other application of the
invalidated regulations that threatens imminent and
concrete harm to the interests of their members. The only
other affidavit relied on was that of Jim Bensman.* He
asserted, first, that he had suffered injury in the past from
development on Forest Service land. That does not suffice
for several reasons: because it was not tied to application
of the challenged regulations, because it does not identify
any particular site, and because it relates to past injury
rather than imminent future injury that is sought to be
enjoined.

Bensman's affidavit further asserts that he has visited
many National Forests and plans to visit several unnamed
National Forests in the future. Respondents describe this
as a mere failure to "provide the name of each timber sale

———————

* After the District Court had entered judgment, and after the Gov-
ernment had filed its notice of appeal, respondents submitted addi-
tional affidavits to the District Court. We do not consider these. If
respondents had not met the challenge to their standing at the time of
judgment, they could not remedy the defect retroactively.

that affected [Bensman's] interests," Brief for Respondents 44. It is much more (or much less) than that. It is a failure to allege that *any* particular timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete plan of Bensman's to enjoy the National Forests. The National Forests occupy more than 190 million acres, an area larger than Texas. See Meet the Forest Service, http://www.fs.fed.us/aboutus/ meetfs.shtml (as visited Feb. 27, 2009, and available in Clerk of Court's case file). There may be a chance, but is hardly a likelihood, that Bensman's wanderings will bring him to a parcel about to be affected by a project unlawfully subject to the regulations. Indeed, without further specification it is impossible to tell *which* projects are (in respondents' view) unlawfully subject to the regulations. The allegations here present a weaker likelihood of concrete harm than that which we found insufficient in *Lyons*, 461 U. S. 95, where a plaintiff who alleged that he had been injured by an improper police chokehold sought injunctive relief barring use of the hold in the future. We said it was "no more than conjecture" that Lyons would be subjected to that chokehold upon a later encounter. *Id.,* at 108. Here we are asked to assume not only that Bensman will stumble across a project tract unlawfully subject to the regulations, but also that the tract is about to be developed by the Forest Service in a way that harms his recreational interests, and that he would have commented on the project but for the regulation. Accepting an intention to visit the National Forests as adequate to confer standing to challenge any Government action affecting any portion of those forests would be tantamount to eliminating the requirement of concrete, particularized injury in fact.

The Bensman affidavit does refer specifically to a series of projects in the Allegheny National Forest that are subject to the challenged regulations. It does not assert, however, any firm intention to visit their locations, saying

only that Bensman "'want[s] to'" go there. Brief for Petitioners 6. This vague desire to return is insufficient to satisfy the requirement of imminent injury: "Such 'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be— do not support a finding of the 'actual or imminent' injury that our cases require." *Defenders of Wildlife*, 504 U. S., at 564.

Respondents argue that they have standing to bring their challenge because they have suffered procedural injury, namely that they have been denied the ability to file comments on some Forest Service actions and will continue to be so denied. But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing. Only a "person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy." *Id.,* at 572, n. 7 (emphasis added). Respondents alleged such injury in their challenge to the Burnt Ridge Project, claiming that but for the allegedly unlawful abridged procedures they would have been able to oppose the project that threatened to impinge on their concrete plans to observe nature in that specific area. But Burnt Ridge is now off the table.

It makes no difference that the procedural right has been accorded by Congress. That can loosen the strictures of the redressability prong of our standing inquiry—so that standing existed with regard to the Burnt Ridge Project, for example, despite the possibility that Earth Island's allegedly guaranteed right to comment would not be successful in persuading the Forest Service to avoid impairment of Earth Island's concrete interests. See *Ibid.* Unlike redressability, however, the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot

Opinion of the Court

be removed by statute.

> "[I]t would exceed [Article III's] limitations if, at the behest of Congress and in the absence of any showing of concrete injury, we were to entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws. . . . [T]he party bringing suit must show that the action injures him in a concrete and personal way." *Id.*, at 580–581 (KENNEDY, J., concurring in part and concurring in judgment).

### III

The dissent proposes a hitherto unheard-of test for organizational standing: whether, accepting the organization's self-description of the activities of its members, there is a statistical probability that some of those members are threatened with concrete injury. Since, for example, the Sierra Club asserts in its pleadings that it has more than "'700,000 members nationwide, including thousands of members in California'" who "'use and enjoy the Sequoia National Forest,'" *post*, at 2 (opinion of BREYER, J.), it is probable (according to the dissent) that some (unidentified) members have planned to visit some (unidentified) small parcels affected by the Forest Service's procedures and will suffer (unidentified) concrete harm as a result. This novel approach to the law of organizational standing would make a mockery of our prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm. In *Defenders of Wildlife*, *supra*, at 563, we held that the organization lacked standing because it failed to "submit affidavits . . . showing, through specific facts . . . that one or more of [its] members would . . . be 'directly' affected" by the allegedly illegal activity. *Morton*, 405 U. S. 727, involved the same Sierra Club that is a party in the present case, and a

project in the Sequoia National Forest. The principal difference from the present case is that the challenged project was truly massive, involving the construction of motels, restaurants, swimming pools, parking lots, and other structures on 80 acres of the Forest, plus ski lifts, ski trails, and a 20-mile access highway. We did not engage in an assessment of statistical probabilities that one of the Sierra Club's members would be adversely affected, but held that the Sierra Club lacked standing. We said:

> "The Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." *Id.*, at 735.

And in *FW/PBS, Inc.* v. *Dallas*, 493 U. S. 215, 235 (1990), we noted that the affidavit provided by the city to establish standing would be insufficient because it did not name the individuals who were harmed by the challenged license-revocation program. This requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity. See, *e.g.*, *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 459 (1958) (all organization members affected by release of membership lists).

A major problem with the dissent's approach is that it accepts the organizations' self-descriptions of their membership, on the simple ground that "no one denies" them, *post*, at 6. But it is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties. *Bender* v. *Williamsport Area School Dist.*, 475 U. S.

534, 541 (1986). Without individual affidavits, how is the court to assure itself that the Sierra Club, for example, has "'thousands of members'" who "'use and enjoy the Sequoia National Forest'"? And, because to establish standing plaintiffs must show that they "use the area affected by the challenged activity and not an area roughly in the vicinity of" a project site, *Defenders of Wildlife*, 504 U. S., at 566 (internal quotation marks omitted), how is the court to assure itself that some of these members plan to make use of the specific sites upon which projects may take place? Or that these same individuals will find their recreation burdened by the Forest Service's use of the challenged procedures? While it is certainly possible— perhaps even likely—that one individual will meet all of these criteria, that speculation does not suffice. "Standing," we have said, "is not 'an ingenious academic exercise in the conceivable' . . . [but] requires . . . a factual showing of perceptible harm." *Ibid.* In part because of the difficulty of verifying the facts upon which such probabilistic standing depends, the Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm—surely not a difficult task here, when so many thousands are alleged to have been harmed.

The dissent would have us replace the requirement of "'imminent'" harm, which it acknowledges our cases establish, see *post*, at 4, with the requirement of "'a *realistic* threat' that reoccurrence of the challenged activity would cause [the plaintiff] harm 'in the reasonably near future,'" *post*, at 5. That language is taken, of course, from an opinion that did *not* find standing, so the seeming expansiveness of the test made not a bit of difference. The problem for the dissent is that the timely affidavits no more meet that requirement than they meet the usual formulation. They fail to establish that the affiants' members will *ever* visit one of the small parcels at issue.

The dissent insists, however, that we should also have considered the late-filed affidavits. It invokes Federal Rule of Civil Procedure 15(d) (West 2008 rev. ed.), which says that "[t]he court may permit supplementation even though the original pleading is defective in stating of a claim or defense." So also does Rule 21 permit joinder of parties "at any time." But the latter no more permits joinder of parties, than the former permits the supplementation of the record, in the circumstances here: *after the trial is over, judgment has been entered, and a notice of appeal has been filed.* The dissent cites no instance in which "supplementation" has been permitted to resurrect and alter the outcome in a case that has gone to judgment, and indeed after notice of appeal had been filed. If Rule 15(b) allows additional facts to be inserted into the record after appeal has been filed, we are at the threshold of a brave new world of trial practice in which Rule 60 has been swallowed whole by Rule 15(b).

\*     \*     \*

Since we have resolved this case on the ground of standing, we need not reach the Government's contention that plaintiffs have not demonstrated that the regulations are ripe for review under the Administrative Procedure Act. We likewise do not reach the question whether, if respondents prevailed, a nationwide injunction would be appropriate. And we do not disturb the dismissal of respondents' challenge to the remaining regulations, which has not been appealed.

The judgment of the Court of Appeals is reversed in part and affirmed in part.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 07–463

PRISCILLA SUMMERS, ET AL., PETITIONERS *v.*
EARTH ISLAND INSTITUTE ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 3, 2009]

JUSTICE KENNEDY, concurring.

I join in full the opinion of the Court. As the opinion explains, "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Ante*, at 8. The procedural injury must "impair a separate concrete interest." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 572 (1992).

This case would present different considerations if Congress had sought to provide redress for a concrete injury "giv[ing] rise to a case or controversy where none existed before." *Id.*, at 580 (KENNEDY, J., concurring in part and concurring in judgment). Nothing in the statute at issue here, however, indicates Congress intended to identify or confer some interest separate and apart from a procedural right.

# SUPREME COURT OF THE UNITED STATES

No. 07–463

PRISCILLA SUMMERS, ET AL., PETITIONERS *v.*
EARTH ISLAND INSTITUTE ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 3, 2009]

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

The Court holds that the Sierra Club and its members (along with other environmental organizations) do not suffer any "'concrete injury'" when the Forest Service sells timber for logging on "many thousands" of small (250-acre or less) woodland parcels without following legally required procedures—procedures which, if followed, could lead the Service to cancel or to modify the sales. *Ante*, at 9. Nothing in the record or the law justifies this counterintuitive conclusion.

## I

### A

The plaintiffs, respondents in this case, are five environmental organizations. The Earth Island Institute, a California organization, has over 15,000 members in the United States, over 3,000 of whom "use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual and other purposes." Corrected Complaint for Declaratory and Injunctive Relief in Case No. CIV–F–03–630 REC DLB (ED Cal.) ¶8, App. 31 (hereinafter Complaint). The Sequoia ForestKeeper, a small organization, has "100 plus" members who "use the forests of the Southern Sierra Nevada for activities such as hik-

ing, bird and animal watching, aesthetic enjoyment, quiet contemplation, fishing and scientific study." *Id.,* ¶9, at 32. Heartwood, Inc., located in Illinois and Indiana, is a coalition of environmental organizations with "members" who "continually use the National Forests for the purposes of ecological health, recreation, aesthetic enjoyment, and other purposes." *Id.*, ¶10, at 33. The Center for Biological Diversity, located in Arizona, California, New Mexico, and Washington, has over 5,000 members who "use Forest Service lands," and who are "dedicated to the preservation, protection, and restoration of biological diversity, native species and ecosystems in the Western United States and elsewhere." *Ibid.*, ¶11. The Sierra Club has more than "700,000 members nationwide, including thousands of members in California" who "use and enjoy the Sequoia National Forest," for "outdoor recreation and scientific study of various kinds, including nature study, bird-watching, photography, fishing, canoeing, hunting, back-packing, camping, solitude, and a variety of other activities." *Id.*, ¶12, at 34.

These five organizations point to a federal law that says the Forest Service "shall establish a notice and comment process," along with a procedure for filing administrative "appeals," for "proposed actions . . . concerning projects and activities implementing land and resource management plans . . . ." §322, 106 Stat. 1419, note following 16 U. S. C. §1612. They add that the Service has exempted from "notice, comment, and appeal" processes its decisions that allow, among other things, salvage-timber sales on burned forest lands of less than 250 acres in size. 36 CFR §§215.4(a), 215.12(f) (2008); see also 68 Fed. Reg. 44607–44608 (2003) (describing projects exempted). And they claim that the Service's refusal to provide notice, comment, and appeal procedures violates the statute. Complaint ¶¶105–106, App. 61.

B

The majority says that the plaintiffs lack *constitutional* standing to raise this claim. It holds that the dispute between the five environmental groups and the Forest Service consists simply of an abstract challenge; it does not amount to the concrete "Cas[e]" or "Controvers[y]" that the Constitution grants federal courts the power to resolve. Art. III, §2, cl. 1. I cannot agree that this is so.

To understand the *constitutional* issue that the majority decides, it may prove helpful to imagine that Congress enacted a *statutory* provision that expressly permitted environmental groups like the respondents here to bring cases just like the present one, provided (1) that the group has members who have used salvage-timber parcels in the past and are likely to do so in the future, and (2) that the group's members have opposed Forest Service timber sales in the past (using notice, comment, and appeal procedures to do so) and will likely use those procedures to oppose salvage-timber sales in the future. The majority cannot, and does not, claim that such a statute would be unconstitutional. See *Massachusetts* v. *EPA*, 549 U. S. 497, 516–518 (2007); *Sierra Club* v. *Morton*, 405 U. S. 727, 734–738 (1972). How then can it find the present case constitutionally unauthorized?

I believe the majority answers this question as follows: It recognizes, as this Court has held, that a plaintiff has constitutional standing if the plaintiff demonstrates (1) an "'injury in fact,'" (2) that is "fairly traceable" to the defendant's "challenged action," and which (3) a "favorable [judicial] decision" will likely prevent or redress. *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 180–181 (2000). The majority does not deny that the plaintiffs meet the latter two requirements. It focuses only upon the first, the presence of "actual," as opposed to "conjectural or hypothetical," injury. *Id.*, at 180. In doing so, it properly agrees that the "organiza-

tions" here can "assert the standing of their members." *Ante*, at 5. It points out that injuries to the "members' recreational" or even "mere esthetic interests . . . will suffice." *Ibid.* It does not claim that the *procedural* nature of the plaintiffs' claim makes the difference here, for it says only that "deprivation of a procedural right *without some concrete interest*" thereby affected, *i.e.*, "a procedural right *in vacuo"* would prove "insufficient to create Article III standing." *Ante*, at 8 (emphasis added); see also *EPA*, 549 U. S., at 517–518. The majority assumes, as do I, that these unlawful Forest Service procedures will lead to substantive actions, namely the sales of salvage timber on burned lands, that might not take place if the proper procedures were followed. But the majority then finds that the plaintiffs have not sufficiently demonstrated that these salvage-timber sales cause plaintiffs an actual injury, that is, harm to the recreational, aesthetic, or other environmental interests of organization members. *Ante*, at 6–7. To put the matter in terms of my hypothetical statute, the majority holds that the plaintiff organizations, while showing that they have members who have used salvage-timber sale parcels in the past (*i.e.*, parcels that the Service does not subject to the notice, comment, and appeal procedures required by law), have failed to show that they have members likely to use such parcels in the future.

## II

How can the majority credibly claim that salvage-timber sales, and similar projects, are unlikely to harm the asserted interests of the members of these environmental groups? The majority apparently does so in part by arguing that the Forest Service actions are not "imminent"—a requirement more appropriately considered in the context of ripeness or the necessity of injunctive relief. See *Ohio Forestry Assn., Inc.* v. *Sierra Club*, 523 U. S. 726, 734

(1998). I concede that the Court has sometimes used the word "imminent" in the context of constitutional standing. But it has done so primarily to emphasize that the harm in question—the harm that was not "imminent"—was merely "conjectural" or "hypothetical" or otherwise speculative. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992). Where the Court has directly focused upon the matter, *i.e.*, where, as here, a plaintiff has *already* been subject to the injury it wishes to challenge, the Court has asked whether there is a *realistic likelihood* that the challenged future conduct will, in fact, recur and harm the plaintiff. That is what the Court said in *Los Angeles* v. *Lyons*, 461 U. S. 95 (1983), a case involving a plaintiff's attempt to enjoin police use of chokeholds. The Court wrote that the plaintiff, who had been subject to the unlawful chokehold in the past, would have had standing had he shown "a *realistic* threat" that reoccurrence of the challenged activity would cause him harm "in the reasonably near future." *Id.*, at 107, n. 7, 108 (emphasis added). Precedent nowhere suggests that the "realistic threat" standard contains identification requirements more stringent than the word "realistic" implies. See *Blum* v. *Yaretsky*, 457 U. S. 991, 1000 (1982).

How could the Court impose a stricter criterion? Would courts deny *standing* to a holder of a future interest in property who complains that a life tenant's waste of the land will almost inevitably hurt the value of his interest—though he will have no personal interest for several years into the future? Would courts deny *standing* to a landowner who complains that a neighbor's upstream dam constitutes a nuisance—even if the harm to his downstream property (while bound to occur) will not occur for several years? Would courts deny *standing* to an injured person seeking a protection order from future realistic (but nongeographically specific) threats of further attacks?

To the contrary, a threat of future harm may be realis-

tic even where the plaintiff cannot specify precise times, dates, and GPS coordinates.  Thus, we recently held that Massachusetts has *standing* to complain of a procedural failing, namely, EPA's failure properly to determine whether to restrict carbon dioxide emissions, even though that failing would create Massachusetts-based harm which (though likely to occur) might not occur for several decades.  *EPA*, 549 U. S., at 522–523.

The Forest Service admits that it intends to conduct thousands of further salvage-timber sales and other projects exempted under the challenged regulations "in the reasonably near future."  See Defendants' Motion to Clarify and Amend Judgment in No. CIV–F–03–6386–JKS–DLB (ED Cal.), pp. 13–14.  How then can the Court deny that the plaintiffs have shown a "realistic" threat that the Forest Service will continue to authorize (without the procedures claimed necessary) salvage-timber sales, and other Forest Service projects, that adversely affect the recreational, aesthetic, and environmental interests of the plaintiffs' members?

Consider: Respondents allege, and the Government has conceded, that the Forest Service took wrongful actions (such as selling salvage timber) "thousands" of times in the two years prior to suit.  *Id.*, at 6; see also *id.*, Exh. 2, Decl. of Gloria Manning, Associate Deputy Chief for National Forest System ¶6, p. 3 (identifying 3,377 "proposed decisions," "[a]s of July 1, 2005," that would be excluded from notice, comment, and appeal procedures).  The Complaint alleges, and no one denies, that the organizations, the Sierra Club for example, have hundreds of thousands of members who use forests regularly across the Nation for recreational, scientific, aesthetic, and environmental purposes.  Complaint ¶¶8–12, App. 31–34.  The Complaint further alleges, and no one denies, that these organizations (and their members), believing that actions such as salvage-timber sales harm those interests, regularly op-

pose salvage-timber sales (and similar actions) in proceedings before the agency. *Ibid.* And the Complaint alleges, and no one denies, that the organizations intend to continue to express their opposition to such actions in those proceedings in the future. *Ibid.*

Consider further: The affidavit of a member of Sequoia ForestKeeper, Ara Marderosian, attached to the Complaint, specifies that Marderosian had visited the Burnt Ridge Project site in the past and intended to return. The majority concedes that this is sufficient to show that Marderosian had standing to challenge the Burnt Ridge Project. The majority must therefore agree that "at least one identified member ha[s] suffered . . . harm." *Ante*, at 9. Why then does it find insufficient the affidavit, also attached to the Complaint, of Jim Bensman, a member of Heartwood, Inc.? That affidavit states, among other things, that Bensman has visited 70 National Forests, that he has visited some of those forests "hundreds of times," that he has often visited the Allegheny National Forest in the past, that he has "probably commented on a thousand" Forest Service projects including salvage-timber sale proposals, that he intends to continue to comment on similar Forest Service proposals, and that the Forest Service plans in the future to conduct salvage-timber sales on 20 parcels in the Allegheny National Forest—one of the forests he has visited in the past. ¶¶6, 13, App. E to Pet. for Cert. 68a, 69a, 71a.

The Bensman affidavit does not say *which particular* sites will be affected by future Forest Service projects, but the Service itself has conceded that it will conduct thousands of exempted projects in the future. Why is more specificity needed to show a "realistic" threat that a project will impact land Bensman uses? To know, virtually for certain, that snow will fall in New England this winter is not to know the name of each particular town where it is bound to arrive. The law of standing does not require the

latter kind of specificity. How could it? And *Sierra Club*
v. *Morton,* 405 U. S. 727, on which the majority so heavily
relies, involved plaintiffs who challenged (true, a "mas-
sive") development, but only on a single previously deter-
mined site, about 80 acres in size, in a portion of the forest
with a "limited . . . number of visitors." *Id.,* at 728. The
Court's unwillingness to infer harm to the Sierra Club's
members there does not demand a similar unwillingness
here, where the challenge is to procedures affecting "thou-
sands" of sites, involving hundreds of times as much acre-
age, where the precise location of each may not yet be
known. In *Sierra Club, ibid.,* it may have been unreason-
able simply to assume that members would suffer an
"injury in fact." But here, given the very different factual
circumstances, it is unreasonable to believe they would
not.

Whatever doubt may remain is settled by the affidavits
the plaintiffs submitted after the Burnt Ridge dispute was
settled (while the other claims in the Complaint remained
alive). The majority says it will not consider those affida-
vits because they were submitted "[a]fter the District
Court had entered judgment." *Ante,* at 6, n. But the
plaintiffs submitted the affidavits after judgment (in
opposition to the Government's motion for a stay) because
the Burnt Ridge dispute on which they had relied to show
standing at the outset of suit had by that point been set-
tled. No longer wishing to rely solely on evidence of their
members' interest in that particular project, the plaintiff
organizations submitted several other affidavits. Why
describe this perfectly sensible response to the settlement
of some of the Complaint's claims as a "retroactiv[e]"
attempt to "me[e]t the challenge to their standing at the
time of judgment"? *Ibid.* In fact, the Government did not
challenge standing until that point, so of course respon-
dents (who all agree had standing at the outset) did not
respond with affidavits until later—when their standing

was challenged. This can hardly be characterized as an attempt to "resurrect and alter the outcome" in the case. *Ante*, at 12. Regardless, the Constitution does not bar the filing of further affidavits, nor does any statute. The Federal Rules of Civil Procedure contain no such bar. Indeed, those Rules provide a judge with liberal discretion to permit a plaintiff to amend a complaint—even after one dispute (of several) is settled. So why would they not permit the filing of affidavits—at least with the judge's permission? See Fed. Rule Civ. Proc. 15(d) ("The court may permit supplementation even though the original pleading is defective in stating a claim or defense").

The affidavits in question describe a number of then-pending Forest Service projects, all excluded from notice, comment, and appeal under the Forest Service regulations and all scheduled to take place on parcels that the plaintiff organizations' members use. Erik Ryberg, for example, a member of the Center for Biological Diversity, described in his affidavit a proposed logging project scheduled for the Payette National Forest—an area with which he is "personally familiar." ¶6, App. 90. A second affidavit filed by Jim Bensman described a salvage-timber sale scheduled for the Hoosier National Forest—an area Bensman had visited "multiple times" and to which he planned to return in the coming weeks—and one planned for the Daniel Boone National Forest—also used by Bensman—which would "impact [Heartwood's] members['] use of the areas." ¶¶8–9, *id.*, at 85–86. The affidavits also describe, among other things, the frequency with which the organizations' members routinely file administrative appeals of salvage-timber sales and identify a number of proposed and pending projects that certain Sierra Club members wished to appeal. See Decl. of René Voss ¶3, *id.*, at 94 (describing a proposed logging and prescribed burn planned for the Gallatin National Forest); Decl. of Craig Thomas ¶¶3, 13, *id.*, at 95, 98 (describing Thomas' "use" and "enjoy[ment]"

of the "Sierra Nevada national forests for recreational, aesthetic, scientific and professional pursuits," and attesting to "eighteen separate logging projects," all categorically excluded, proposed for one such forest tract).

These allegations and affidavits more than adequately show a "realistic threat" of injury to plaintiffs brought about by reoccurrence of the challenged conduct—conduct that the Forest Service thinks lawful and *admits* will reoccur.  Many years ago the Ninth Circuit warned that a court should not "be blind to what must be necessarily known to every intelligent person." *In re Wo Lee*, 26 F. 471, 475 (1886).  Applying that standard, I would find standing here.

*    *    *

I recognize that the Government raises other claims and bases upon which to deny standing or to hold that the case is not ripe for adjudication.  I believe that these arguments are without merit.  But because the majority does not discuss them here, I shall not do so either.

With respect, I dissent.