CALLAHAN, Circuit Judge,
dissenting:
The State of Alaska appeals the District Court for the District of Alaska’s decision setting aside the Departure of Agriculture’s exemption of the Tongass National Forest from the Roadless Rule. The majority holds that Alaska has standing to appeal based on a statutory entitlement— *972 an option to collect a share of the revenue the United States makes from timber harvested from national forests in Alaska. See 16 U.S.C. § 500 (creating the National Forest Receipts Program). But Alaska does not have standing based on this statutory interest. A statutory provision is insufficient to establish Article III standing where, as here, the right it creates has not been invaded, Congress did not intend to legislate standing, and no factual injury has been suffered. The majority strays well beyond Article Ill’s confines in holding that Congress legislated standing by creating a revenue-sharing program. The majority alarmingly opens the door to governance of the nation’s natural resources by injunction, but only to those groups powerful enough to secure a statutory entitlement tied to development of those resources. Moreover, Alaska has not lost any revenue or even alleged that it will receive less money from the federal government if the district court’s decision stands. I respectfully dissent.
I.
This Court’s jurisdiction is limited by Article III of the Constitution to “cases” and “controversies.” U.S. Const., Art. Ill, § 2. One element of the Constitution’s case-or-controversy requirement is that a litigant must demonstrate standing to sue. Clapper v. Amnesty Int’l USA — U.S. —, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013). The standing requirement is built on separation-of-powers principles; it “serves to prevent the judicial process from being used to usurp the powers of the political branches.” Id. The standing requirement “must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance.” Hollingsworth v. Perry, — U.S. —, 133 S.Ct. 2652, 2661, 186 L.Ed.2d 768 (2013) (citation omitted).
States generally may seek to bring suit in three capacities: (1) “proprietary suits,” in which states sue like private parties to remedy a concrete, particularized injury; (2) “sovereignty suits,” in which states, for example, seek adjudication of boundary or water rights; and (3) “parens patriae suits,” in which states sue on behalf of their citizens.[1] Alfred L. Snapp & Son v. Puerto Rico, ex rel. Barez, 458 U.S. 592, 600, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). To establish standing to sue in a proprietary capacity a State, like other litigants, must meet the following, familiar requirements:
First, the plaintiff must have suffered an “injury in fact” — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) “actual • or imminent, not ‘conjectural or hypothetical.’” Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be “fairly ... traee[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.” Third, it must be “likely,” as opposed to merely “speculative,” that the injury will be “redressed by a favorable decision.”
Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (footnote and citations omitted).
Alaska’s standing fails at the first step. Alaska has not demonstrated that reinstatement of the Roadless Rule’s application to the Tongass has caused, or imminently will cause, the State an injury in fact. This is the “first and foremost” requirement of standing, Arizonans for Official English v. Arizona, 520 U.S. 43, 64, *973 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), “a hard floor of Article III jurisdiction that cannot be removed by statute.” Summers v. Earth Island Inst., 555 U.S. 488, 497, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009).
II.
Alaska advances three interests for purposes of demonstrating injury in fact: (1) a statutory interest in “the flow of monies to the State via the National Forest Receipts Program”; (2) a procedural interest based on the fact that the Department of Agriculture “initiated the rulemaking [that led to the Tongass exemption] pursuant to a settlement agreement with the State”; and (3) a parens patriae interest in Alaskan jobs that are “tied to timber.” None of these asserted harms satisfies Article Ill’s injury-in-fact requirement.
A.
The majority finds that Alaska has standing because of “the effect of the Roadless Rule on Alaska’s statutory entitlement” under the National Forest Receipts Program to twenty-five percent of gross receipts of timber sales from national forests in the State. Without the Ton-gass exemption, the majority explains, less timber will be harvested from the Tongass National Forest, thus potentially decreasing the amount of revenue that Alaska may receive under the National Forest Receipts Program. This statutory entitlement argument fails for at least two reasons.
1.
First, by creating a “statutory entitlement” to a share of federal timber revenue, Congress did not legislate the Article III standing of state and local governments to challenge federal natural resource management. The Supreme Court has strongly suggested that Congress cannot create injury in fact by legislative fiat — -rather, a litigant must have suffered not only a violation of a legal right, but also a factual harm. See, e.g., Summers, 555 U.S. at 497, 129 S.Ct. 1142; Lujan, 504 U.S. at 578, 112 S.Ct. 2130. But it still may be that “Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.” Linda R.S. v. Richard D., 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). We, for example, have held that a statutory provision may provide a litigant with Article III standing where (1) Congress indicated that it intended for the provision to create a statutory right by creating a “private cause of action to enforce” the provision, (2) the litigant’s statutory right has been infringed, and (3) the litigant has also suffered a concrete, “de facto injury,” albeit one that was previously inadequate at law. Robins v. Spokeo, Inc., 742 F.3d 409, 412-13 (9th Cir.2014), cert. granted, — U.S. —, 135 S.Ct. 1892, 191 L.Ed.2d 762 (2015).
Even if Congress may legislate standing in some circumstances, however, it has not done so here. There is no indication in 16 U.S.C. § 500’s text or history that Congress intended to legislate state and municipal standing to challenge the federal government’s management of national forests. See Edwards v. First Am. Corp., 610 F.3d 514, 517 (9th Cir.2010) (“Essentially, the standing question in such cases [where a litigant asserts standing based on a statutory right] is whether the ... statutory provision on which the claim rests properly can be understood as granting persons in the plaintiffs position a right to judicial relief.”) (citation omitted), cert. dismissed as improvidently granted, — U.S. —, 132 S.Ct. 2536, 183 L.Ed.2d 611 (2012).[2] *974 Indeed, in the 107 years since § 500 was enacted, no court has found that the law gives states standing to challenge actions or inactions that may reduce federal timber receipts.
Moreover, even if Congress intended for § 500 to confer a statutory right to revenue, the invasion of which constitutes injury in fact, the right does not entitle Alaska to standing here because it has not been infringed. See Linda R.S., 410 U.S. at 617 n. 3, 93 S.Ct. 1146 (“Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.” (emphasis added)).[3] Section 500 entitles Alaska to a share of revenue generated, not a right to have revenue generated. Alpine Cnty., Cal. v. United States, 417 F.3d 1366, 1368 (Fed.Cir.2005) (there is “no duty to generate revenue” under the National Forest Receipts Program). Thus, Alaska’s entitlement to a share of federal timber revenufe has not been “invaded” by reinstatement of the Roadless Rule, even assuming that Alaska could show that the Roadless Rule will cause Alaska to receive less money from the federal government.
The majority conflates the injury-in-fact requirement with the zone-of-interest test in discussing Lexmark International, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). The zone-of-interest test asks whether an injury to a litigant that meets Article Ill’s injury-in-fact requirement falls within the zone of interests protected by the substantive statute under which that litigant sues. Id. at 1387-89. If not, the litigant’s claim under that statute may not proceed.[4] Id. at 1388-89 (explaining that “the zone-of-interests test is [a] tool for determining who may invoke [a] cause of action.... ”). I agree with the majority that whether an injury in fact falls within a statute’s zone of protected interests is not a jurisdictional question. See id. at 1387-88 & n. 4.
This appeal presents a different, critical, and jurisdictional question that is rooted in Article Ill’s case-or-controversy requirement: whether a statutory provision that has not been invaded and does not include a cause of action endows a litigant who has *975 not suffered a de facto injury with Article III standing. The answer to this jurisdictional question is clearly no. Because Alaska’s statutory right under § 500 has not been invaded, Alaska lacks both injury in law and injury in fact. Attempting to sidestep this problem, the majority suggests that Alaska does not need to demonstrate an injury in fact to maintain this appeal, it need only demonstrate a “stake in defending” the Tongass exemption. Maj. Op. 963-64, 965. This suggestion is contrary to controlling Supreme Court precedent and our circuit precedent. Diamond v. Charles, 476 U.S. 54, 66-69, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (dismissing for lack of jurisdiction because a defendant intervenor did not demonstrate an injury in fact necessary to establish his standing to appeal); Kootenai Tribe of Idaho, 313 F.3d at 1109 (“To establish standing [to appeal], the defendant-inter-venors must first show that they have suffered an injury in fact....”).
The prospective effects of the majority’s decision are alarming. After today, states and many local governments presumably have standing, at least in the Ninth Circuit, to challenge federal actions and inac-tions that may result in, among other things, fewer trees being felled in federal forests, less oil, gas, and coal being extracted from federal mineral estates, fewer cattle being turned out on public lands, or even the devaluation of federal land. States and local communities get a share of revenue generated from these and many other federal resources.[5] Surely by creating a revenue-sharing program tied to the development of natural resources Congress did not legislate state and municipal standing to challenge the pace and manner of the federal government’s management of the nation’s natural resources.
This case is not like Watt v. Energy Action Educational Foundation, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981), the case on which the majority relies. In Watt, California had standing based on its interest in “assuring] a fair return for its resources,” specifically state-owned oil and gas reserves drained by drilling on adjoining federal leases.[6] Id. at 161, 102 S.Ct. 205 (emphasis added); see also id. at 160, 102 S.Ct. 205 (“California ... claim[ed] standing as an involuntary ‘partner’ with the Federal Government in the leasing of [Outer Continental Shelf (OCS) ] tracts in which the underlying pool of gas and oil lies under both the OCS and the 3-miile coastal belt controlled by California.” (emphasis added)). The very language that the majority excerpts also makes it plain that California’s standing was based on the State’s “own[ership of] adjoining portions of an [OCS] oil and gas pool” and interest in securing a “fair market return” for drainage of those State-owned resources. Maj. Op. 965 (quoting Watt, 454 U.S. at 160-61, 102 S.Ct. 205). Alaska has not alleged injury to its interest in being fairly *976 compensated for or avoiding damage to its natural resources, which would implicate an injury in fact. Watt, 454 U.S. at 160-61, 102 S.Ct. 205.[7]
To be clear, the Supreme Court did not hold in Watt, as suggested by the majority, that the revenue sharing required by section 8(g) of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1337(g)(2), provides states with standing to challenge federal actions and inactions that may result in less oil and gas being extracted from the federal OCS. Rather, section 8(g) embodies a state’s interest in being fairly compensated for development of the federal OCS that diminishes the state’s resources. Absent harm to a state’s resources or an invasion of that state’s right to be fairly compensated for diminishment of those resources, section 8(g) does not support that state’s standing to challenge federal management of the OCS.[8] Watt does not support Alaska’s standing to appeal.
2.
Second, when Alaska appealed in June of 2011, Alaska had not lost any National Forest Receipts Program money and did not even allege that it would receive less money from the federal government as a result of the district court’s decision setting aside the Tongass exemption. This was no oversight. Rather, as Alaska acknowledged in its declaration in support of its motion to intervene, it has for many years elected to forego its share of federal timber revenue in order to receive much larger federal funding under the Secure Rural Schools Program. See Secure Rural Schools and Community Self-Determination Act of 2000, Pub.L. No. 106-393, 114 Stat. 1607.[9] Thus, for example, in fiscal *977 year 2010 — before the Tongass exemption had been set aside by the district court— Alaska would have been due only about $517,948 under the National Forest Receipts Program as compared to the $16,027,564.62 it was paid under the Secure Rural Schools Act Program.[10]
Stated simply, Alaska cannot show us the money. Alaska has neither suffered a financial loss traceable to the district court’s decision nor shown that such injury is “certainly impending.” Clapper, 133 S.Ct. at 1147. That Alaska might elect to receive payments under the National Forest Receipts Program at some unknown future date in the currently unforeseeable event that the Secure Rural Schools Program is discontinued is too “conjectural or hypothetical” and insufficiently “actual or imminent” of an injury to support Alaska’s standing. Lujan, 504 U.S. at 560, 112 S.Ct. 2130; see also, e.g., Sturgeon, 768 F.3d at 1075 (“Alaska’s claims regarding its sovereign and proprietary interests lack grounding in a demonstrated injury.... Any injury to Alaska’s sovereign and proprietary interest is pure conjecture and thus insufficient to establish standing.”).[11]
Alaska’s entitlement under 16 U.S.C. § 500 to a share of federal timber revenue does not give it standing to maintain this appeal.
B.
Alaska also alleges injury to what it characterizes as a procedural interest in the Tongass exemption. Alaska states that the Department of Agriculture “initiated the rulemaking [that resulted in the Tongass exemption] pursuant to a settlement agreement with the State.” This interest is not an injury in fact. First, Alaska has not alleged that its rights under the settlement agreement have been violated. As the settlement agreement required, the Department of Agriculture initiated the rulemaking and published the resulting rule. Second, even assuming that Alaska has alleged a violation of a relevant procedural right, Alaska cannot establish its standing to appeal based on a procedural interest alone. It is well established that “deprivation of a procedural right without some concrete interest that is affected by the deprivation — a procedural right in vacuo — is insufficient....” Summers, 555 U.S. at 496, 129 S.Ct. 1142; see also Sturgeon, 768 F.3d at 1075. Thus, Alaska’s asserted legal interests do not demonstrate an injury in fact.
C.
Without an injury of its own, Alaska attempts to invoke someone else’s injury. Alaska asserts that it has standing because “Alaska jobs are tied to timber.” This general interest in the employment of its citizens is a parens patriae interest.[12] *978 However, “[a] State does not have standing as. parens patriae to bring an action against the Federal Government.” Snapp, 458 U.S. at 610 n. 16, 102 S.Ct. 3260. That is because “it is no part of [a State’s] duty or power to enforce [its citizens’] rights in respect of their relations with the Federal Government. In that field it is the United States and not the State, which represents them as parens patriae.” Id. (quoting Massachusetts v. Mellon, 262 U.S. 447, 485-86, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)).
Alaska lacks parens patriae standing in this case for another reason. Alaska has not shown, as it must, that directly interested private parties — Alaskans and companies interested in jobs tied to Tongass timber — could not represent themselves. See, e.g., Snapp, 458 U.S. at 607, 102 S.Ct. 3260 (“In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties....”); Sturgeon, 768 F.3d at 1075 n. 4; Oregon v. Legal Servs. Corp., 552 F.3d 965, 970-71 (9th Cir.2009). These groups are entirely capable of representing themselves. Indeed, the Alaska Forest Association, a trade association for the timber industry in Alaska, intervened in the district court but decided not to appeal. Alaska’s interest in protecting the jobs of Alaskans and the bottom line of the timber industry is an insufficient parens patriae interest to support its standing to appeal.
Alaska has not satisfied the injury-in-fact requirement. Its alleged injuries fail to ensure that the decision to appeal has not been “placed in the hands of ‘concerned bystanders,’ who will use it simply as a ‘vehicle for the vindication of value interests’ ” or party politics, rather than to remedy actual or imminent harm. Hollingsworth, 133 S.Ct. at 2663 (citing Diamond, 476 U.S. at 62, 106 S.Ct. 1697). This appeal should be dismissed for lack of jurisdiction.
III.
As the majority finds that this Court has jurisdiction and thus decides this appeal on the merits, I must reach the merits too. The same concern with the judiciary’s limited role compels me to join Judge M. Smith’s dissent on the merits. Congress in the Administrative Procedure Act did not authorize a judge, or even an en banc panel of judges, to set aside an agency decision because the reasons the agency proffered for the decision were not, from the viewpoint of the bench, “good” enough. Rather, an agency’s decision must stand if it is not “arbitrary or capricious.” 5 U.S.C. § 706. The Supreme Court’s decision in FCC v. Fox Television Stations, Inc., 556 U.S. 502, 514-16, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009), does not hold otherwise. See, e.g., White Stallion Energy Ctr. LLC v. EPA, 748 F.3d 1222, 1235 (D.C.Cir.2014) (judicial review of a “change in agency policy is no stricter than our review of an initial agency action” (citing Fox, 556 U.S. at 514-16, 129 S.Ct. 1800)). Fox holds that an agency must “provide reasoned explanation for its action,” which normally requires “that it display awareness that it is changing position.” Fox, 556 U.S. at 515, 129 S.Ct. 1800 (emphasis omitted); see also Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42-43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (“Normally, an agency rule would be arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem.”).
Here, the Department of Agriculture met Fox’s requirement by acknowledging that it was changing its mind. The Department also met the APA’s requirements by explaining that the exemption would allow for a better balance between environmental preservation, road access, and timber availability. The balance the De *979 partment struck is reasonable and well within its mandate under the National Forest Management Act and the Tongass Timber Reform Act to “provide for multiple use and sustained yield” of forest resources. 16 U.S.C. §§ 539d(1), 1604(e)(1).
“Litigation over the last two years” was not, as the majority suggests, an extra-statutory weight that entered into the Department’s “enormously complicated task of striking a balance among the many competing uses to which land can be put.” Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (addressing the Bureau of Land Management’s similar statutory charge). Rather, litigation was part of what prompted the Department to consider striking a different balance.
The significance of the Tongass exemption’s foreseeable environmental and socioeconomic impacts did enter into that balance, and were detailed by the Department in its Environmental Impact Statement (EIS) and discussed in its Record of Decision. The majority latches onto one word in setting aside the Department’s decision. It faults the Department for calling the risk to roadless values — one of the many natural resources provided by the Tongass — “minor.” See 68 Fed.Reg. 75,136, 75,144 (Dec. 30, 2003). It is clear, however, that the Department was not tossing aside its analysis of the significance of environmental impacts set forth in the EIS. Instead, after further consideration, the Department found that the loss of some roadless values did not outweigh “the socioeconomic costs of applying the roadless rule’s prohibitions to the Tongass.” Id. The Department’s explanation of its balance was not arbitrary or capricious.
IV.
I would dismiss this case for lack of appellate jurisdiction. Stuck with the majority’s finding that this Court has jurisdiction, I would reverse and remand.

. States also may seek to protect their “quasi-sovereign” interests in such suits, but "evidence of actual injury is still required.” Sturgeon v. Masica, 768 F.3d 1066, 1074 (9th Cir.2014); see also Snapp, 458 U.S. at 607, 102 S.Ct. 3260.

. Other courts have disagreed that a statutory provision can create standing in the absence of actual harm. See, e.g., David v. Alphin, 704 *974 F.3d 327, 338-39 (4th Cir.2013) (''[T]his theory of Article III standing is a non-starter as it conflates statutory standing with constitutional standing.”); see also Joint Stock Soc’y v. UDV N. Am., Inc., 266 F.3d 164, 176 (3d Cir.2001) (Alito, J.). To the extent that Congress may legislate Article III standing, however, it follows that a Court must employ the usual tools of statutory interpretation to determine if Congress intended for a statutory provision to create standing.

. See also Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (same); Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1109 (9th Cir.2002) ("To establish standing [to appeal], the defendant-interve-nors must first show that they have suffered an injury in fact, [which involves, among other things,] an invasion of a legally-protected interest....” (quotation marks omitted)), abrogated by Wilderness Soc. v. U.S. Forest Serv., 630 F.3d 1173 (9th Cir.2011); Consumer Watchdog v. Wisc. Alumni Research Found., 753 F.3d 1258, 1262 (Fed.Cir.2014) (dismissing for lack of standing because, ”[u]nlike the plaintiffs in the [Freedom of Information Act] and [Federal Election Campaign Act] cases, Consumer Watchdog was not denied anything to which it was entitled”), cert. denied, — U.S. —, 135 S.Ct. 1401, 191 L.Ed.2d 360 (2015).

. For example, if Alaska had alleged that reinstatement of the roadless rule caused a State-owned timber business to suffer a financial loss, Alaska would have demonstrated an injury in fact for purposes of Article III standing. However, this “purely economic interest” would fall outside of the zone of interests protected by the National Environmental Policy Act under our precedent. Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 940 (9th Cir.2005).

. See, e.g., 43 U.S.C. §§ 315b, 315i, 315m (Grazing Leases Payments); 7 U.S.C. § 1012 (National Grasslands Payment); 30 U.S.C. §§ 191, 355 (Mineral Leasing Payments); 43 U.S.C. § 1337(g) (Offshore Mineral Leasing Payment); 42 U.S.C. § 6506a (National Petroleum Reserve in Alaska Payment); 16 U.S.C. § 715s (Refuge Revenue Sharing Payment); 31 U.S.C. §§ 6901-6907 (Payments in Lieu of Taxes); 16 U.S.C. §§ 577g, 577g-1 (Payments to Minnesota); 43 U.S.C. § 1181f (Oregon and California Grant Lands Payments); 43 U.S.C. § 1181f-1 (Coos Bay Wagon Road Grant Fund Payment); P.L. 100-446, § 323 (Arkansas Smoky Quartz Payment).

. In Watt, California challenged the federal government's bidding system for lease sales allowing for oil and gas development of the Outer Continental Shelf. California claimed that the bidding system was incapable of producing a fair market return for California's oil and gas drained by drilling on federal leases. Id. at 160-61, 102 S.Ct. 205.

. See also, e.g., Massachusetts v. EPA, 549 U.S. 497, 522, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) ("Because the Commonwealth owns a substantial portion of the state's coastal property,” and "rising seas have already, begun to swallow Massachusetts’ coastal land,” it "has alleged a particularized injury in its capacity as a landowner.” (internal citation, quotation marks, and footnote omitted)); Wyoming v. U.S. Dep't of Agric., 570 F.Supp.2d 1309, 1329 (D.Wyo.2008), rev'd on other grounds, 661 F.3d 1209 (10th Cir.2011) (finding that "Wyoming has presented evidence that the Roadless Rule will increase the risk of environmental harm to its thousands of acres of state forest land that are adjacent to, or intermingled with, lands designated by the Forest Service as inventoried roadless areas”).

. Section 8(g) can thus be viewed as an exercise of Congress's uncontroversial power to "expand standing by enacting a law enabling someone to sue on what was already a de facto injury to that person....” Doe v. Nat’l Bd. of Med. Exam’rs, 199 F.3d 146, 153 (3d Cir.1999) (Becker, C.J., joined by Scirica and Alito, LL). Congress may "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law,” Lujan, 504 U.S. at 578, 112 S.Ct. 2130, or that were deemed incognizable as a prudential matter by the courts, Warth, 422 U.S. at 500 & n. 12, 95 S.Ct. 2197. See also Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 773, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). Section 500 is not such a statute; it does not elevate any de facto harm. But section 8(g) does. Section 8(g) was intended to provide states with fair and easily administered compensation for drainage of state oil and gas from common-pool reservoirs. See, e.g., H.R.Rep. No. 95-590, at 1550 (1977) (explaining that the statute was intended to resolve “the problem of drainage of state resources by a lessee operating on the Outer Continental Shelf'); H.R.Rep. No. 99-300 at 547 (1985) (explaining that an amendment of section 8(g) was necessary because case-by-case determinations of " 'fair and equitable disposition' of the common pool revenues” had led to "lengthy litigation”).

.Congress created the Secure Rural Schools Act and has continued to reauthorize it, see Maj. Op. 965 n. 9, because "precipitously” declining timber revenue from national forests had decreased "the revenues shared with the affected counties.” Pub.L. No. 106-393 § 2(a)(9)-(10), 114 Stat. 1607 (Oct. 30, 2000).

. This data is available on the U.S. Forest Service’s website, http://www.fs.usda.gov/ main/pts/securepayments/projectedpayments (last visited June 18, 2015), and taken specifically from the "View ASR 10-1 FY2010” spreadsheet and "all counties FY 2010” tab of the "Estimated 25-percent payments, FY 2008-FY2010” spreadsheet.

. The majority’s analogy to the loss of one’s home due to a neighbor’s negligence misses the point. Loss of one’s home is an injury in fact. A statutory financial entitlement untethered to a violation of that entitlement and an actual or imminent financial loss traceable to that violation is not.

.See, e.g., City of Rohnert Park v. Harris, 601 F.2d 1040, 1044-45 (9th Cir.1979) (alleged "loss of investment profits and tax revenues” by citizens if development did not proceed implicates a parens patriae interest); Pennsylvania v. Kleppe, 533 F.2d 668, 671 (D.C.Cir.1976) ("[AJUeged injuries to the state’s economy and the health, safety, and welfare of its people clearly implicate the parens patriae rather than the proprietary interest of the state.”).