**SEQUOIA FORESTKEEPER, Plaintiff,**

v.

**Teresa BENSON, et al., Defendants.**

**No. 1:14–cv–00341 LJO SKO.**

United States District Court,
E.D. California.

Signed June 5, 2015.

Rene Peter Voss, Rene P. Voss, Attorney at Law, San Anselmo, CA, Matt Kenna, Phv, Public Interest Environmental Law, Durango, CO, for Plaintiff.

Julie S. Thrower, U.S. Department of Justice, San Francisco, CA, Tyler Burgess, Govt., U.S. Department of Justice, Washington, DC, for Defendants.

**MEMORANDUM DECISION AND ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT (DOCS. 47 & 55)**

LAWRENCE J. O'NEILL, District Judge.

## I. *INTRODUCTION*

Plaintiff Sequoia ForestKeeper ("ForestKeeper") challenges the United States Forest Service's ("Forest Service") Decision Notice and Finding of No Significant Impact ("Decision Notice") for the Hume Roadside and Recreation Site Hazard Tree Project ("Hume Hazard Tree Project" or "Project") in the Giant Sequoia National Monument ("the Monument") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.,* the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.,* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). Plaintiff also alleges that elements of the Giant Sequoia National Monument Management Plan ("Monument Management Plan") contravene the Proclamation ("Monument Proclamation") which established the Monument.

## II. *BACKGROUND OF THE CASE*

In September 2013, the Forest Service issued a Decision Notice, Hume0176–190,[1] authorizing the implementation of the Hume Hazard Tree Project, and adopting Alternative D from the Project's Final Environmental Assessment ("EA"), Hume0191–357. Alternative D proposed the felling of hazard trees along 58 miles of roads and within eleven developed campgrounds and residential areas in the Hume Lake Ranger District of the Sequoia National Forest and the Monument. Hume0176. As described in the EA, hazard trees are dead or damaged trees that are susceptible to falling onto roadways and recreation sites, and are therefore deemed hazardous to people. Alternative D also proposed the sale and removal of 2000 CCF (centum cubic feet, equivalent to 100 cubic feet) of wood as logs over the next two years. Hume0178; Hume0209. The Forest Service also considered Alternative C, which called for felling the same number of trees as under Alternative D; but not for removing them. Hume0206.

Plaintiff appealed the approval of the Decision Notice to the Forest Service in November 2013. Hume0040–68. In January 2014, the Forest Service affirmed the District Ranger's rationale and decision to implement Alternative D. Hume0001–3. On March 1, 2014, the Forest Service announced that it would accept sealed bids for the timber sale. Doc. No. 11–14.

Plaintiff filed a complaint March 7, 2014 and on March 16 moved for a preliminary injunction ("PI") halting the sale and removal of trees under the authority of the Hume Hazard Tree Project. Doc. No. 10–1. Plaintiff alleges, first, that the Forest Service's authorization of the Project is inconsistent with the Monument Management Plan's requirement not to remove trees from the project area unnecessarily, and that this inconsistency violates NFMA's requirement that the Forest Service actions "shall be consistent" with land

1. The administrative record for the Hume Hazard Tree Project is numbered "Hume0001," *et seq.* The administrative record for the Giant Sequoia National Monument Management Plan is numbered "GSNM0001," *et seq.*

management plans. Compl. at ¶ 77 (quoting 16 U.S.C. § 1604(i)). Plaintiff's second cause of action alleges the authorization also violates NEPA because the Forest Service failed to disclose how it will determine whether tree removal can be justified and failed to analyze available hazard tree data. Compl. ¶¶ 82–84 (quoting 40 C.F.R. §§ 1500.1(b) & 1502.24). Plaintiff's third claim alleges that the Monument Management Plan itself is flawed because the "vague and unenforceable" criteria it outlines for the removal of trees is inconsistent with the proclamation establishing the Monument. Compl. ¶¶ 87–88. Plaintiff brings all claims under the APA, 5 U.S.C. § 706(2), on the basis that the Forest Service's approval of the Project and the Management Plan are final agency actions that are "arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedures required by law." Compl. ¶¶ 80, 85, & 89.

The Forest Service received no bids for its proposed timber sale. Doc. 17. On April 3, 2014, Plaintiff withdrew its PI subject to a stipulation in which parties agreed that the Forest Service could use its own contractors and employees to fell hazard trees, but would not sell the trees or remove them from the Project Area unless this case is resolved in the Forest Service's favor. *Id.* at ¶ 2.

On June 4, 2014, Defendant Forest Service District Ranger Teresa Benson issued a decision to withdraw authorization of the decision to sell and remove trees from the Project Area by striking the sentence authorizing this sale from the Decision Notice. Doc. 23–2 ("Withdrawal Notice"). In an accompanying document, Benson explained that it was not economically feasible to use a timber sale for the removal of trees the Forest Service felled pursuant to its stipulation. Doc. 23–3 ("Withdrawal Memo"). Because the Forest Service had considered this situation under Alternative C in the EA, Benson concluded that she did not need to supplement or revise the EA to accommodate the change in position. *Id.* Neither document altered the Forest Service's approval of Alternative D as the preferred alternative. Rather, the Withdrawal Memo stated that the "analysis and conclusions in the original Environmental Assessment are still valid." *Id.*

On June 9, 2014, Defendants moved to dismiss the case on the basis that Benson's withdrawal of the approval to sell and remove trees from the project area mooted Plaintiff's claims. Doc. 37. This Court denied Defendants' Motion to Dismiss on the basis that the Forest Service's voluntary cessation of the timber sale did not moot ForestKeeper's claims and that the EA remains a "continuing and brooding presence that looms over Plaintiff's interests." Mem. Decision and Order Re: Mot. to Dismiss and Mot. to Strike (August 2014 Order), Doc. 37 at 8–11. The Court also held that ForestKeeper had standing to challenge the Monument Management Plan. *Id.* at 13.

On January 30, 2015, Plaintiff timely filed its cross-motion for summary judgment. Mem. in Supp. of Pl.'s Mot. For Summ. J. (Pl.'s MSJ), Doc. 47. At this time, Plaintiff also moved to admit extra-record evidence consisting of two declaration describing scientific analyses Plaintiff alleges the Forest Service should have considered in its decision-making process. Plaintiff's Motion to Admit Extra–Record Evidence, Doc. 48. The Court granted Plaintiff's request for the limited purpose of helping this Court to evaluate whether the Forest Service sufficiently considered how the adoption of Alternative D would affect levels of downed wood in the Project Area. Doc. 53. Defendant timely filed its cross-motion for summary judgment on March 25.2015. Defs.' Memo. In Supp. of Cross–Mot. for Summ. J. (Defs.' MSJ),

Doc. 55. Plaintiff filed a Response/Reply on April 17, 2015. Resp./Reply in Supp. of Pl.'s Mot. for Summ. J. (Pl.'s Response), Doc. 57. Defendants filed their reply on May 8, 2015. Defs.' Reply in Supp. of Cross–Mot. For Summ. J. (Defs.' Reply), Doc. 59. A hearing date was set for May 20, 2015, but the Court vacated the hearing pursuant to Local Rule 230(g).

## III. *STANDARD OF DECISION*

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The claims in this case arise under the APA, 5 U.S.C. §§ 701–706, pursuant to which "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* § 702.5 Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be": "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; and/or "(D) without observance of procedure required by law[.]" *Id.* § 706. Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a).

A court conducting APA judicial review may not resolve factual questions, but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella,* 459 F.Supp.2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir.1985)). "[I]n a case involving review of a final

agency action under the [APA] ... the standard set forth in Rule 56[ (a) ] does not apply because of the limited role of a court in reviewing the administrative record." *Id.* at 89. In this context, summary judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

Eastern District of California Local Rule 260(a) directs that each motion for summary judgment shall be accompanied by a "Statement of Undisputed Facts" that shall enumerate each of the specific material facts on which the motion is based and cite the particular portions of any document relied upon to establish that fact. In APA cases, such statements are generally redundant because all relevant facts are contained in the agency's administrative record. *See San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.,* 819 F.Supp.2d 1077, 1083–84 (E.D.Cal.2011).

## IV. *ANALYSIS*

### A. *Standing and Mootness as Applied to Plaintiff's First Two Causes of Action*

In its Complaint, Plaintiff alleged that the proposed sale and removal of trees in the Hume Hazard project violated NFMA and NEPA. Compl. ¶¶ 78, 83–84. Defendants subsequently withdrew their decision to sell and remove trees when they were not immediately able to find a buyer for the wood. This Court found that the Forest Service's "failure in the marketplace" did not mean that circumstances had changed such that "it would be unreasonable to expect a future timber sale to occur in the Project Area." August 2014 Order at 9. In their cross motion for summary judgment, Defendants argue that circumstances have (again) changed such that "removal of the felled trees is not only

highly speculative, it will never occur." Defs.' MSJ at 9. On this basis, Defendants argue that Plaintiff lacks standing to bring their claims.

■ As Plaintiff points out, Defendants appear to confuse standing with mootness. "The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint." *Skaff v. Meridien N. Am. Beverly Hills, LLC,* 506 F.3d 832, 838 (9th Cir.2007) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 571 n. 4, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "In contrast, mootness reflects the requirement that the controversy remain live even after the plaintiff demonstrates initial standing." *Skysign Intern., Inc. v. City and County of Honolulu,* 276 F.3d 1109, 1114 (9th Cir. 2002).

Defendants cite to a few Supreme Court cases for the theory that plaintiffs can "lose" standing. Defs.' Reply at 1. These cases, however, reflect that litigants must maintain a personal stake in the litigation; a concept encapsulated by mootness doctrine. First, *Hollingsworth v. Perry,* —— U.S. ——, 133 S.Ct. 2652, 2661, 186 L.Ed.2d 768 (2013), presented unique circumstances where an intervener was found not to have standing to appeal a District Court's holding. Moreover, the *Hollingsworth* Court relied on *Already, LLC v. Nike, Inc.,* —— U.S. ——, 133 S.Ct. 721, 726, 184 L.Ed.2d 553 (2013) and *Arizonans for Official English v. Arizona,* 520 U.S. 43, 72, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), which were decided on mootness grounds, when it addressed Article III's "demands that an 'actual controversy' persist throughout all stages of litigation." *Id.* In *Summers v. Earth Island Inst.,* 555 U.S. 488, 494, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009), the Supreme Court upheld a district court opinion which essentially found that the parties' settlement agreement mooted the case. *Id.* ("Marderosian's inju-

ry in fact with regard to that project has been remedied, and it is, as the District Court pronounced, "not at issue in this case." "). Finally, the issue in *Gollust v. Mendell,* 501 U.S. 115, 126, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991), was whether changed circumstances (acquisition of a corporation) meant that a shareholder plaintiff no longer had enough of a personal stake to prosecute an action seeking redress for insider trading.

■ This Court discussed the legal standards for mootness in its August 22, 2014 Order. An issue is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.,* 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). Even if a case is technically moot, a case may nevertheless be justiciable if one of three exceptions to the mootness doctrine applies: (1) where a plaintiff "would suffer collateral legal consequences if the actions being appealed were allowed to stand"; (2) where defendant voluntarily ceased the challenged practice; and (3) for "wrongs capable of repetition yet evading review." *Ctr. for Biological Diversity v. Lohn,* 511 F.3d 960, 964 (9th Cir.2007).

■ The Supreme Court has addressed this issue squarely:

Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To abandon the case at an advanced stage may prove more wasteful than frugal. This argument from sunk costs does not license courts to retain jurisdiction over cases in which one or both of the parties plainly lack a continuing interest, as when the parties

have settled or a plaintiff pursuing a nonsurviving claim has died ... But the argument surely highlights an important difference between the two doctrines. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 191–92, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). One important manifestation of the difference between standing and mootness is that "the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* at 189, 120 S.Ct. 693. In the August 2014 Order, this Court found that Plaintiff had standing and that that the Forest Service's withdrawal of the decision to sell and remove trees fell within the voluntary exception to the mootness doctrine.

Defendants now present evidence in the form of a second declaration from District Ranger Benson attesting to the fact that almost all activities authorized by the Decision Notice and the parties' stipulations have been completed. Second Decl. of Teresa Benson ("Benson Decl. 2"), Doc. 55–3. Benson describes that all hazard trees located in campgrounds have been felled, cut into logs and made available to campground users for firewood. *Id.* at ¶¶ 6–7. According to Benson, "there are no hazard trees remaining to be felled in the campgrounds under the Decision Notice, and all authorized activities have been completed except for burning of the debris/slash piles..." *Id.* at ¶ 7. Similarly, Benson testifies that all hazard trees located along roads have also been felled. *Id.* at ¶ 8. She states that all roadside hazard trees have been left on the ground to serve as downed wood material. *Id.* On this basis, Benson concludes, "there is no decision in place which authorizes [tree] removal nor any proposed project currently being planned that would remove any of the logs." *Id.* at ¶ 10. Finally, Benson states: "I am committing that I will not

propose any project or activity which sells or removes as saw logs, biomass, or any other wood product (except for wood removed from the Monument under valid personal use firewood permits), any of the trees felled as part of the Hume Hazard Tree project, either under this Project EA, or under any future project decision or proposed sale." *Id.* On this basis, Defendants assert that the Court no longer has jurisdiction to hear the case. Defs.' MSJ at 10; Defs.' Reply at 2.

■ Plaintiff argues that this testimony does not introduce any new facts that would justify revisiting the issue of mootness. Pl.'s Response at 4. Plaintiff explains that its suit did not challenge the Forest Service's decision to fell hazard trees, so the fact that the felling is now complete does not change the circumstances. *Id.* This Court agrees that the mere completion of the felling the trees in the area does not amount to a change in circumstances. Benson's testimony, however, also describes the disposition of these trees; they have all been either been chopped for use as firewood, placed into debris piles for firewood or left on the ground with the intention that they remain there to serve as downed wood material. Benson Decl. 2 ¶¶ 6–8. Benson also expressly commits that none of the felled trees will be removed from the Monument as part of the Hume Hazard Tree Project. *Id.* at ¶ 10. Plaintiff does not dispute these facts. Nor does Plaintiff point to evidence it could produce that would give a factfinder a reason to discredit Benson's testimony. These facts are significant because they signal a commitment to retain trees under the Hume Hazard Project and effectively moot Plaintiff's claims. Where an agency effectively cancels a challenged action and there is "no immediate prospect of another, similar [action]" that means "the end of the 'case,' constitutionally and

practically." *Nome Eskimo Cmty. v. Babbitt,* 67 F.3d 813, 815 (9th Cir.1995).

### 1. *Voluntary Cessation Exception*

 Plaintiff argues that the Court should retain jurisdiction of this case under the voluntary cessation exception. Pl.'s Response at 4. This argument is based on the theory that Defendants' representations do not ensure that trees will not be removed from the monument "in the future." *Id.* Voluntary cessation, however, is precluded when (1) "it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *United States v. Brandau,* 578 F.3d 1064, 1068 (9th Cir.2009). Here, the activity challenged in Plaintiff's first two causes of action is the sale and removal of wood as permitted in the Hume Hazard Project. Compl. ¶¶ 75–85. Defendants' burden is therefore to show that circumstances have changed such the Hume Hazard Project will not support the sale and removal of trees and that there is no other prospect that the Hume Hazard Project will be restarted. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 719, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) (finding voluntary cessation did not moot a case where plaintiff may again be subject to allegedly unlawful conduct). Defendants have met this burden with Benson's second declaration because they have shown that the Hume Hazard Project has not and will not support the sale and removal of trees. *Cf. Logan v. U.S. Bank Nat. Ass'n,* 722 F.3d 1163, 1166 (9th Cir. 2013) (court retained jurisdiction where bank produced "no evidence or reassurance" that it would not reinitiate the challenged unlawful detainer action.) Thus, the voluntary cessation exception does not apply.

### 2. *Capable of Repetition, Yet Evading Review Exception*

 Plaintiff also argues that the "capable of repetition yet evading review" exception applies here. In order to fit this exception, a controversy must meet two requirements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982).

Plaintiff argues persuasively that the first element of this analysis is met because hazard tree projects typically are implemented within one season of the decision. Pl.'s Response at 6–7. In support of this position, Plaintiff points to Benson's testimony describing the timeline of events in this case. *Id.* Notably, Defendants do not challenge this point. This Court agrees that the timeline of the hazard tree plan (several months at most) is consistent with what the Ninth Circuit considers to be short in duration. *See Alaska Ctr. For Env't v. U.S. Forest Serv.,* 189 F.3d 851, 855 (9th Cir.1999) (two-year permit period satisfies duration element "because the duration of the permit is too short to allow full litigation before the permit expires"); *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1329–30 (9th Cir.1992) (regulation "in effect for less than one year" met durational requirement).

 Defendants do contest that there may be a reasonable expectation that Plaintiff will confront the same action again. Defs.' Reply at 5–6. Plaintiff argues that its litigation history with the Forest Service reflects that it will. Pl.'s Response at 7–8. The "capable of repetition test" is different from the one for voluntary cessation in that it examines the likelihood of the issue resurfacing, rather

than the specific activity challenged. *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174 (9th Cir.2002) (holding that Endangered Species Act claim at issue was "capable of repetition" where parties "have been through the same controversy many times," even though previous lawsuits were about different species.). For example, the expiration of Forest Service approval letters allowing mining activities did not deprive the federal court of jurisdiction in a case where Plaintiffs showed that the Forest Service continued to approve similar activities that invoked the same complaint: that doing so without conducting proper biological consultations violated the Endangered Species Act. *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1019 (9th Cir.2012). Defendants cite to several cases to support their theory that Plaintiff must show that the Forest Service will rely on the same challenged administrative action. Defs.' Reply at 6. These cases, however, all invoke instances where an agency has shown that it cannot or will not rely on the *substance* of those former actions. *Feldman v. Bomar*, 518 F.3d 637, 644 (9th Cir.2008) (case not capable of repetition where plaintiffs challenged "only the onetime process by which the final EIS was approved" for eradication of non-native feral pigs in national park, once all pigs were eradicated); *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1075 (9th Cir.1995) (no live controversy once the challenged biological opinion had been superseded by a more recent version); *Ramsey v. Kantor*, 96 F.3d 434, 446 (9th Cir. 1996) (case moot where Defendants showed that they were using "a different method of calculating the baseline" than the one challenged by plaintiffs).

Also contrary to Defendants' assertion, whether similar events occurred in the past *is* potentially dispositive of the application of the "capable of repetition but evading review" exception. *Demery v. Ar-*

*paio*, 378 F.3d 1020, 1027 (9th Cir.2004) (repeated past conduct on multiple occasions taken as evidence of likely repetition); *Natural Resources Defense Council, Inc. v. Evans*, 316 F.3d 904, 910 (9th Cir. 2003) (same, noting that agency repeatedly applied the same, challenged rationale, "year after year"); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329–30 (9th Cir. 1992) (one subsequent instance of agency relying on allegedly insufficient biological opinion sufficient to find reasonable expectation of recurrence). This Court has previously applied this exception where the challenged conduct occurred on only one prior occasion. *San Luis & Delta–Mendota Water Authority v. Jewell*, 52 F.Supp.3d 1020, 1045 (E.D.Cal.2014).

 Plaintiff argues that it has a reasonable expectation that it will again have to litigate "the issue of whether tree removal is clearly needed and whether the Forest Service can remove trees without first assessing it will meet its down log standards, under the same circumstances as here in future hazard tree projects in the Monument." Pl.'s Response at 7. In support, Plaintiff points to a previous case brought in this Court, which challenged the sale and removal of hazard trees in the Monument under many of the same theories alleged here. Complaint, Doc. 1, *Sequoia ForestKeeper v. Exline*, No. 1:09–cv–01519–OWW–SMS (E.D.Cal. August 26, 2009). In that case, the court denied Plaintiff's motion for a preliminary injunction and the trees were felled and removed before Plaintiff could prosecute the case. *Id.* M.O. 36. Plaintiff also claims that the Forest Service announced on its website that it plans to fell and remove hazard trees from the Lloyd Meadow Road area later this spring. Pl.'s Response Ex. B. The issue in these cases is whether the Forest Service may approve the removal of an unspecified number of hazard trees

from the Monument and be compliant with the Plan's Criteria for tree removal. Pl.'s Response at 7. Defendants do not dispute that both the 2009 case and the plans for 2015 involve similar issues. Defs.' Reply at 6. Nor do they dispute that the operative Monument Plan, which Plaintiff also challenges in this action, permits this very activity. Rather, Defendants rely on the erroneous theory that Plaintiff must show that future litigation will invoke the Hume Hazard Tree Project specifically. Defs.' Reply at 6. As discussed in the August 2014 Order, the narrowness of the Forest Service's actions in withdrawing support for the Hume Hazard Project, coupled with Plaintiff's previous litigation and the Forest Service's future plans, show that there is a reasonable expectation that the parties will engage in similar litigation in the future. Thus, a declaratory judgment regarding the Project's compliance with NFMA and NEPA would provide meaningful relief.

For these reasons, the Court DENIES Defendants' request to dismiss Plaintiff's first two causes of action.

**B.** *Jurisdiction to Hear Plaintiff's Third Cause of Action*

Defendants' argument that this Court lacks jurisdiction to review Plaintiff's challenges to the Monument Plan relies on a finding that the Court lacks jurisdiction to review the Hazard Tree Project. Defs.' MSJ at 11; Defs.' Reply at 6. As discussed above, the Court does have jurisdiction to hear Plaintiff's first two claims. *See also* August 2014 Order. Therefore, the Court

DENIES Defendants' request to dismiss Plaintiff's third causes of action.

**C.** *Whether the Monument Plan's Tree Removal Criteria Are Arbitrary and Capricious*

 Plaintiff's third cause of action alleges that the Monument Management Plan should be set aside under the APA because it violates requirements set forth in the Monument Proclamation. Compl. ¶¶ 86–89.[2] The Monument Proclamation provides that trees be removed from the Monument "only if clearly needed for ecological restoration and maintenance or public safety." Proc. No. 7295, 65 Fed. Reg. 24,095, 24,097 (Apr. 15, 2000). Plaintiff argues that the criteria set out in the Management Plan allow for trees to be removed for much broader reasons. Pl.'s MSJ at 22–25; Opposition at 18–21. An agency's findings under an Executive Order, however, will only be set aside if they are arbitrary, capricious, or an abuse of discretion. *City of Carmel–By–The–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir.1997) (citing 5 U.S.C. § 706(2)(A)). To determine whether an agency violated the arbitrary and capricious standard, this court must determine whether the agency articulated a rational connection between the facts found and the choice made. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy*, 898 F.2d 1410, 1414 (9th Cir.1990) (citing *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 982 (9th Cir.1985)). As long as the agency decision was based on a consideration of

**2.** Executive Orders can be enforceable privately under the APA under "certain circumstances." *City of Carmel–By–The–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir.1997); *see also Sierra Club v. Peterson*, 705 F.2d 1475, 1478 (9th Cir.1983) ("The fact that there is no express or implied private right of action under EO 12088 does not prevent review of agency action under the

APA."). Because Defendants do not argue that Plaintiff may not enforce the Monument Plan, the Court assumes for the sake of this motion that it may. *See also W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F.Supp.2d 951, 968 (D.Ariz.2009) (finding the Sonoran Desert National Monument Proclamation judicially enforceable).

relevant factors and there is no clear error of judgment, the reviewing court may not overturn the agency's action as arbitrary and capricious. *Amer. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991); *Citizens to Preserve Overton Park, Inc.*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The basis for the decision, however, must come from the agency. The reviewing court may not substitute reasons for agency action that are not in the record. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("[T]he focal point for judicial review is the administrative record in existence...."). *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir.2001).

The Forest Service developed three criteria to help it determine when there is a "clear need" to remove trees. GSNM05243. These criteria are:

> R1) If keeping trees on site would cause "unacceptable fuels accumulation and fire severity effects ... of removing trees would reduce the risk of wildfire..."
>
> R2) If keeping trees on site "would provide a vector for insect or disease ingestations at levels higher than currently known endemic levels..."
>
> R3) If keeping trees on site "would create a public safety hazard or attractive nuisance."

*Id.* Mechanical removal is limited to certain areas that make up 23% of the Monument's footprint. GSNM05242. Tree removal is further constrained by certain guidelines that "preclude or impose limitations on resource management activities." GSNM05246. The guideline most relevant to this case is the one stating that "trees may not be removed if they are needed to meet downed wood standards of 10 to 20 tons per acre in logs greater than 12 inches in diameter." GSNM05251.

Plaintiff argues that the R1–R3 criteria are impermissibly vague, and need to be quantified. Pl.'s MSJ at 22–25; Pl.'s Response at 19. Defendants counter that the Proclamation grants them leeway to develop guidance and allows for it to make case-by-case decisions. Defs.' MSJ at 18, Defs.' Reply at 8–10.

Plaintiff points out that a "vague directive" that provides an agency is "unfettered discretion" may be arbitrary. Opposition at 19 (quoting *Arizona*, 273 F.3d at 1250–51). Arbitrariness, however, must be evaluated with respect to the directive the agency implements. *Arizona*, the case relied on most heavily by Plaintiff, involved the review of conditions imposed under an incidental take statement (ITS). *Id.* at 1249. An ITS "[s]pecifies the impact, i.e., *the amount or extent*, of such incidental taking on the species." 50 C.F.R. § 402.14(i)(1)(i) (emphasis added). The Ninth Circuit held that while this generally meant a numerical value would be appropriate, other objective criteria could be substituted "so long as these conditions are linked to the take of the protected species." *Arizona*, 273 F.3d at 1250. The Fish and Wildlife issued a permit stating that an incidental take levels would be exceeded if "[e]cological conditions do not improve under the proposed livestock management." *Id.* at 1249. The Ninth Circuit found the conditions arbitrary on the basis that they failed to establish a link between the activity being permitted (cattle grazing) and the taking of species, *as required by the ESA and its implementing regulations. Id.* at 1251.

Defendants argue here and in the record that neither the Proclamation nor the scientific literature require numeric standards to be in place at forest planning level. Defs.' MSJ at 18. In a letter to Plaintiff, the Forest Service explained that mechanical treatment will depend on cer-

tain factors (i.e. canopy cover) that must be evaluated on a site by site basis. GSNM11862. For this reason, the Forest Service decided not to provide threshold values for the R1–R3 criteria in the Monument Management Plan. *Id.*

The Court agrees that while the requirement that trees may be removed "only if clearly needed," imposes a substantive standard, the Proclamation does not require that the Forest Service quantify the need in the forest plan. Nor does the Proclamation set forth any independent procedural steps that are analogous to an ITS. Thus, there is no basis for Plaintiff's argument that the Management Plan must identify numeric values or ensure compliance with the Proclamation independently. Here the Forest Service found that it would be more appropriate to ensure compliance on a project-by-project basis. GSNM11861. Plaintiff provides no viable theory as to why it was arbitrary or capricious for the Forest Service to do so. The Forest Service is entitled to summary judgment as to this issue.

## D. *Whether the Hume Hazard Project Violates NFMA*

### 1. *NFMA Background*

 The NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level. *Native Ecosystems Council v. Weldon,* 697 F.3d 1043, 1056 (9th Cir.2012) (citing 16 U.S.C. § 1604). On the forest level, the Forest Service develops a Land and Resource Management Plan ("Forest Plan"), which consists of broad, long-term plans and objectives for the entire forest. Forest Plans are designed to manage forest resources by balancing the consideration of environmental and economic factors. *Citizens for Better Forestry v. U.S. Dep't of Agric.,* 341 F.3d 961, 966 (9th Cir.2003). The Forest Ser-

vice implements the Forest Plan when approving or denying site-specific projects. 16 U.S.C. § 1604(i). While NFMA requires that the proposed site-specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference. *Forest Guardians v. U.S. Forest Serv.,* 329 F.3d 1089, 1097 (9th Cir.2003). The Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA. *Native Ecosystems Council v. U.S. Forest Serv.,* 418 F.3d 953, 961 (9th Cir.2005).

### 2. *NFMA Analysis*

The Monument Management Plan is a subset of the 1988 Sequoia National Forest Land and Resource Management Plan and subject to NFMA. GSNM05169.

#### a. *Compliance With Downed Wood Standards*

 Monument Plan guidelines state that trees may not be removed if they are needed to meet downed wood standards of 10 to 20 tons per acre in logs greater than 12 inches in diameter. GSNM05251. Defendants argue that even under Alternative D, no trees would have been removed unless those standards were met. Defs.' MSJ at 13. Plaintiff argues that the Forest Service authorized the timber sale without first determining the standards could be met; and that the data at the time showed that the removal of *any* trees would make compliance with the Monument Plan impossible. Pl.'s MSJ at 11. Plaintiff argues that because the only difference between Alternative D and Alternative C is permission to remove trees, and because there is no way to remove trees while complying with the downed wood standards, there was no "rational connection" between these facts and the decision to adopt Alternative D. *Id.; see also* Pl.'s Response at 10.

The EA clearly states that "the existing level of large down woody debris along the roads is low." Hume0223. It goes on to state that "a portion of the felled trees would be left to meet the 10 to 20 tons per acre standard," and that Alternative D would only allow "the rest of the trees not needed to meet dead and down standards to be removed as logs or firewood." Hume0224. It also explains that the Forest Service will track this compliance by "conductin[ing] monitoring during and after project implementation to ensure the standard is met." Hume0236. The record makes clear that the only difference between Alternative C and D is whether to leave felled hazard trees in place. Hume0378. Thus, it is only logical to assume that the Forest Service anticipated removing *some* number of felled trees when it approved Alternative D over Alternative C. Originally, this number was estimated at about 2,000 board feet of wood. Hume0209; Hume0178. This number also appears to have been used to estimate the costs of each alternative. Hume0211. It is unclear, however, where this number came from. Defendants do not identify any basis for its derivation. Therefore, the Court can only conclude it is completely arbitrary. Since the Forest Service relies on these figures throughout the EA and Decision Notice as a basis for its preference of Alternative D, it cannot hide behind the fact that ultimately, no trees were removed. Moreover, Defendants' argument that it is possible that *no* trees would be removed under Alternative D is disingenuous. If they intended to approve this scenario, they would have approved Alternative C.

The crux of Plaintiff's argument is that the Forest Service's decision fails to account for how the removal of *any* trees could possibly result in compliance with the Monument Plan. Plaintiff cites to the Forest Service's own admission that the most recent monitoring study estimated

that there was only 7.68 tons per acre of downed wood material. Hume0223. Using information provided by the Forest Service, Plaintiff estimated in comments that are part of the record that even if *all* hazard trees identified at the time were left in place, that downed wood levels would only reach 8.15 tons per acre. Hume0800. Defendants did not dispute this estimate, or its implications regarding compliance with the Monument Plan, in the record. Nor do Defendants address these issues now in their briefings. Instead, the Forest Service relies on the position expressed in the Decision Notice that "Forest Service personnel would conduct monitoring during and after the project implementation to ensure the standard is being met." Hume0236. Without explaining how this approach might possibly lead to compliance with the downed wood standards, Defendants argue that its bare assertion is entitled to deference and a "presumption of regularity." Defs.' MSJ at 13.

An agency's conclusions are entitled to substantial deference when they are rationally related to underlying facts. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Here, however, the Forest Service has not explained how its original decision to remove trees is supported by its data; or how its plan to "conduct monitoring" would ensure compliance with the downed wood standards. Given that the evidence placed in the record by Plaintiff runs counter to the agency's decision, the Court cannot see how the Forest Service's silence on the matter may be permitted deference. The Forest Service must rationally explain why its decision to fell trees complies with the Monument Plan's guidelines to be entitled to deference. *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1026–27 (9th Cir.2011) (finding that Forest Service

failed to rationally relate predicted loss of whitebark pine with its conclusion that the loss did not present a threat to Yellowstone grizzly population and the delisting decision); *cf. League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1134 (9th Cir.2010) ("In the ROD, the Forest Service also explained that 'reduction of competition between trees in overstocked sites through commercial thinning is a hedge against epidemic loss of the larger trees to insect and disease.' Thus, the Forest Service determined that cutting some larger diameter trees was clearly necessary and met the NWFP standard."); *Lands Council v. McNair*, 537 F.3d 981, 998 (9th Cir. 2008) ("As explained, in this case, the Forest Service detailed the methodology it used for determining the amount of suitable habitat and acknowledged the assumptions underlying its use of habitat as a proxy."); *Forest Guardians.*, 329 F.3d at 1099 ("It was rational for the Service to conclude that, although there had been failures in the past, monitoring was the *only* way to effectively predict wild ungulate use of the land.") (emphasis added).

The Forest Service's approval of Alternative D also relied upon its assumption that Alternative D had economic advantages. However, if no downed wood was removed, then it could not pass off service costs (estimated at $38,000) to a logging operation. Hume0246. Thus, there would be no economic benefit to choosing Alternative D. As the Forest Service admits, economic considerations played a significant role in its evaluation of whether the tree removal was clearly needed pursuant to the criteria identified above. Defs.' MSJ at 14 ("Part of the reason the selected alternative, Alternative D was feasible, is because the tree removal provided a cost offset that 'increased the likelihood of implementing the Project in a timely manner and maintaining public access.'") (quoting Hume0258). As discussed above, Defen-

dants have identified no rational basis for concluding that any trees could be removed from the Monument in compliance with downed wood standards. Similarly, Defendants have no identified any rational basis for its conclusions that selling downed logs would produce enough revenue to cover service costs. Thus, any reliance on economic benefits as a basis for approving Alternative D was also arbitrary.

Because the Forest Service's conclusion that its adoption of Alternative D complies with the Monument Plan's downed wood standards is not rationally supported by evidence in the record, it must be set aside. Plaintiff is entitled to summary judgment on this issue.

### b. *Compliance With Other Plan Criteria*

The Monument Plan states that mechanical treatment "will only be considered if other methods do not meet ecological objectives in the project purpose and need." GSNM05246. To evaluate this need, the Forest Service is directed to analyze "the risks and hazards of leaving trees in the Monument, the effectiveness of the treatment, and feasibility..." *Id.* These analyses must show that "mechanical treatment is clearly needed to reduce the risk to acceptable levels, make the project effective in meeting restoration and protection objectives, and make it feasible." *Id.* To justify tree removal alone, the Plan requires that maintaining "one or more trees onsite" would meet R1, R2 or R3 criteria. GSNM05243.

The EA describes that the Hazard Tree Project is

> ... designed to mitigate the public safety hazard of trees or limbs falling and hitting people or other targets, adding to existing fuel loads, making fire control and emergency evacuation more difficult, or increasing the likelihood of vehi-

cle accidents along roadways and designated recreation sites where there is a risk to forest visitors from falling limbs or trees.

Hume0257. It goes on to describe that the Forest Service identified hazard trees along roadways, in several campgrounds and near a residential tract of land. *Id.* The EA concludes that mechanical treatment posed an "acceptable risk" and that removal as firewood or logs would "help offset some of the costs" of the Project, "increasing the likelihood of implementing the project in a timely manner and maintaining public access." Hume0258. Defendants also argue that the Alternative D was approved on the basis that tree removal was clearly needed for public safety reasons and wildfire protection. Defs.' MSJ at 15 ("The Forest Service's legitimate concerns for public safety described in the EA are sufficient to support tree removal and Plaintiff has failed to demonstrate a NFMA violation."). The record suggests that the Forest Service also concluded that tree removal would minimize infestation. Hume0260.

### (1) *Public Safety*

■ The Forest Service concluded that leaving trees on the ground could "become a hazard to visitors if they choose to move or alter the position of downed trees ... large down trees have the potential to roll and topple onto visitors, causing serious injury." Hume0217. "Leaving the downed trees on site could create ... an attractive nuisance (people may climb on the piled trees) ... Downed trees along roads can create safety hazards by obstructing drivers' lines of sight ..." Hume0261. Plaintiff argues that this argument is absurd because the EA also describes that under Alternative C, large downed material would be relocated from recreation areas to other places in the monument. Pl.'s MSJ at 15 (citing Hume0224). Plaintiff also claims that

there is nothing in the record to suggest that downed trees will actually present such risks. Pl.'s Reply at 13. The Court agrees. The record does not show that trees in any particular area are likely to cause any particular safety hazard if they are not removed entirely from the Monument. Rather, these risks are entirely speculative. Because the basis for concluding that these risks exist has no identifiable basis in fact, it must be set aside. *Forest Guardians v. U.S. Forest Serv.,* 329 F.3d 1089, 1099 (9th Cir.2003) ("An agency's actions need not be perfect; we may only set aside decisions that have no basis in fact, and not those with which we disagree.").

### (2) *Wildfire Prevention/Mitigation*

■ The Forest Service argues that downed logs need to be removed from the Monument to reduce risks associated with wildfires. Defs.' MSJ at 15. The EA states that "[l]arge down logs adjacent to roadways would add to existing fuel loads, make fire control and emergency evacuation more difficult ..." Hume0258. "Alternative C is most likely to leave the most large, woody material on the ground, and therefore have the most potential for future increases in fire intensity and flame lengths in isolated pockets." Hume0244. These conclusions are based, in part, on findings presented in a "Fire Fuels Specialist Report" ("Fire Report"). Hume0665–667. The Fire Report explained that while both Alternatives C & D would "meet project purpose to maintain public safety," one consequence of leaving downed wood in place would be "increasing the fire behavior potential over many years." *Id.*

Plaintiff argues that the Monument Plan only permits tree removal when fuels accumulate beyond an acceptable level of risk. Pl.'s Reply at 13. Plaintiff further argues

that the Forest Service never found that fuel load would be unacceptable under Alternative C; nor would the record support such a finding. *Id.* Rather, the Forest Service admitted that Alternative C "would not pose a fire hazard because large boles (20 inches or larger) rarely burn." Hume0180. The fact that the Forest Service never found that Alternative C would lead to an unacceptable accumulation of fuel is not a semantic defect. Rather, it reflects the fact that the Forest Service never estimated how many trees would be left in place. Without doing so, it cannot conclude that these trees will lead to an unacceptable risk. Thus, its decision is not based in fact, and must be set aside.

### (3) *Disease Management*

■■■ The Monument Plan allows trees to be removed if they would "provide a vector for insect or disease infestations at levels higher than currently known endemic levels." GSNM05243. The environmental assessment concluded that:

> ... the trees identified as falling dangers to people are dead or dying and, if left on the ground as down wood, would continue to provide hosts for insects and vectors for disease ... removing them may help prevent insect or disease outbreaks above endemic levels that could kill the majority of trees in the vicinity ... Therefore, it is expected that removing some of these trees would make these forest stands more resilient to insects, disease, and other forest stressors.

Hume0260. Plaintiff argues that the Forest Service's conclusions are insufficient because they do not *actually* find that leaving trees on site would result in infestation levels higher than whatever is currently know. Pl.'s MSJ at 18. The Forest Service does not actually dispute this argument in its papers. Nor do Defendants identify facts in the administrative record that would show that leaving trees on site would actually increase levels of infestation. Thus, the Forest Service had no rational basis for approving tree removal based on this criteria.

As discussed above, Plaintiff has shown that there is no rational basis for concluding that tree removal under Alternative D would have complied with the Monument Plan's tree removal criteria, violating NFMA and the APA. Therefore, it must be set aside. Plaintiff is entitled to declaratory judgment on this issue.

### E. *NEPA Claims*

#### 1. *NEPA Background*

■■■ NEPA requires agencies to ensure professional and scientific integrity, by setting forth the methodologies used and making "explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1160 (9th Cir.2006) (citing 40 C.F.R. § 1502.24), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).[3] "The sweeping policy goals announced in § 101 of NEPA are [ ] realized through a set of 'action-forcing procedures' that require that agencies take a 'hard look' at environmental consequences," and that provide for broad dissemination of relevant environmental information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109

---

**3.** By its terms, Section 1502.24 only applies to preparation of an EIS, but the Forest Service does not dispute that this scientific integrity requirement applied to their EA. Therefore, we assume without deciding that this requirement does in fact apply to the Hume Hazard Tree Project EA. *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1019 (9th Cir.2012).

S.Ct. 1835, 104 L.Ed.2d 351 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). "An agency must set forth a reasoned explanation for its decision and cannot simply assert that its decision will have an insignificant effect on the environment." *Marble Mountain Audubon Soc. v. Rice*, 914 F.2d 179, 182 (9th Cir.1990).

### 2. *NEPA Analysis*

■ Plaintiff argues that the Forest Service's failure to disclose its methodology for estimating how it would comply with downed wood standard violated NEPA's prohibition on "uniformed agency action." Pl.'s MSJ at 20. Defendants argue that the Forest Service complied with NEPA by disclosing the method and the results of its 2012 downed wood analysis. Defs.' MSJ at 16. The Forest Service concluded, based on that data, that it would conduct additional monitoring during the project to ensure that the downed wood standard would be met. *Id.* Defendant argues that Plaintiff "conflates the substantive obligations of NFMA with the procedural requirements of NEPA." Defs.' MSJ at 16.

To be sure, NEPA does not require the Forest Service to ensure that its projects comply with the Monument Management Plan. Rather, it requires that the Forest Service "set forth a reasoned explanation" for its decision to remove trees from the Monument and not "simply assert that its decision will have an insignificant effect." *Marble Mountain*, 914 F.2d at 182. As discussed above, Defendants failure to explain how their plan to determine how many trees it will remove on an ad hoc basis fails to do that.

■ Courts defer to agency expertise where the agency shows that data, at least generally, support their conclusions. For example, in *Earth Island Inst. v. U.S. Forest Service*, environmental groups challenged the Forest Service's conclusion in

an EA that a planned project would not lead to a change in black-becked woodpecker populations. 697 F.3d at 1018. Plaintiffs argued that the Forest Service erred by not analyzing habitat at the project level. *Id.* at 1015. Citing to several studies in the record that showed that woodpecker populations were stable at the bioregion level, the Ninth Circuit found that the "data sufficiently support[ed] the agency's claim" about the project's impacts. *Id.* at 1020. In contrast, in *Oregon Natural Res. Council Fund v. Goodman*, the Ninth Circuit found that the Forest Service violated NEPA because it failed to substantiate its conclusion that the expansion of a ski resort into a wildlife corridor would have an "inconsequential effect" on habitat. 505 F.3d 884, 892 (9th Cir.2007).

Here, the Forest Service's data does not support its claim that any amount of tree removal would allow it to establish an adequate quantity of downed wood. In fact, the Forest Service's own reports conclude that there was an inadequate amount of downed wood at the time. Hume0182. Defendants now argue that future monitoring could somehow ensure that that there would be enough downed because "the amount of downed woody debris in an area is not a static value." Defs.' MSJ at 17. However, Defendants do not point to any evidence in the record to show that ecosystem dynamics would contribute to downed wood levels in a manner that would offset the effects of tree removal. Thus the Forest Service's assertion that future monitoring could somehow ensure that there would be enough wood on the ground is not sufficiently supported by the data. *Earth Island Inst.*, 697 F.3d at 1020. Therefore, it must be set aside.

### V. *CONCLUSION AND ORDER*

For the reasons discussed above, the Court finds in favor of the Defendants as

to Plaintiff's Third Cause of Action and in favor of the Plaintiff as to its First and Second Causes of Action. The Forest Service's Decision to approve Alternative D must be set aside because it was reached in violation of NFMA and NEPA under the standards dictated by the APA.

IT IS SO ORDERED.